IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF OHIO
EASTERN DIVISION

| JASON KOSTURA, | ) | Case No. 1:16-cv-01824 |
| --- | --- | --- |
| | ) | |
| Plaintiff, | ) | JUDGE BENITA Y. PEARSON |
| | ) | |
| v. | ) | MAGISTRATE JUDGE |
| | ) | THOMAS M. PARKER |
| COMMISSIONER OF SOCIAL SECURITY, | ) | |
| | ) | |
| Defendant. | ) | **REPORT AND RECOMMENDATION** |
| | ) | |

## I.  Introduction

Plaintiff Jason Kostura seeks judicial review of the final decision of the Commissioner of Social Security ("Commissioner") denying his applications for supplemental security income ("SSI") and disability insurance benefits ("DIB") under Title II and XVI of the Social Security Act.  This matter is before the court pursuant to 42 U.S.C. §1383(c)(3), 42 U.S.C. §405(g) and Local Rule 72.2(b).

Because the ALJ supported her decision with substantial evidence, and because the ALJ correctly applied the applicable law, I recommend that the final decision of the Commissioner be **AFFIRMED**.

## II.  Procedural History

Kostura filed applications for SSI and DIB in October 2012, alleging a disability as of April 30, 2009.  (Tr. 201-16, 251)  Kostura's applications were denied initially and upon

reconsideration. (Tr. 68-121) Kostura then requested an administrative hearing. (Tr. 154-55) Administrative Law Judge Traci Hixson ("ALJ") heard the case on February 19, 2015. (Tr. 33-68) On May 1, 2015, the ALJ issued a decision denying Kostura's claim for benefits. (Tr. 14-32) The Appeals Council declined to review that decision on January 20, 2016, rendering the ALJ's decision the final decision of the Commissioner. (Tr. 1-4)

### III. Documentary Evidence

Kostura was born on July 9, 1974. (Tr. 211) He previously worked as a foam installer/laborer, a construction laborer, and road mechanic/technician. (Tr. 256) On April 30, 2009, Kostura sustained injury to his knee and back after the truck he was driving hydroplaned, skidded off the road, and flipped over onto the driver's side. (Tr. 386)

#### A. Medical Evidence

After his trucking accident, Kostura was examined by Michael Urbanc, D.C. (Tr. 410) A subsequent MRI revealed increased signal in the posterior horn of the medial meniscus (Type I instrasubstance injury). (Tr. 452) After six months of conservative treatment, Kostura's condition had not improved and he was referred to orthopedic surgeon Robert Mark Fumich, M.D. for a surgical consultation. (Tr. 374)

On December 30, 2009, Dr. Fumich performed right knee arthroscopic surgery on Kostura. (Tr. 375) Post-operatively, Kostura participated in physical therapy. (Tr. 372) He exhibited some tenderness but had full range of motion. (Id.)

In February 2010, Dr. Urbanc ordered a MRI due to Kostura's complaints of back pain with lower extremity radicular symptoms. (Tr. 391) The MRI revealed non-compressive concentric disc bulging at L4-5 and L5-S1. (387, 391) Orthopedic surgeon Robert D. Zaas, M.D., examined Kostura on March 5, 2010, for his low back symptoms. (Tr. 386) Kostura

2

reported low back pain, somewhat more marked on the left, with occasional radiating pain into his left hip and leg. (Tr. 386-87) Dr. Zaas reviewed the MRI and stated as follows, "I am not able to determine if the MRI scan findings are significant as would relate to the persisting symptoms but further observation would be necessary because of concern that disk (sic) bulging at two levels maybe (sic) precursors of future herniation." (Tr. 388) On examination, Dr. Zaas reported that Kostura was able to stand and walk without difficulty but complained of pain upon rising from a seated position. (Tr. 387) Dr. Zaas noted tenderness and a low-grade muscle spasm more marked on the left. (Id.) Dr. Zaas prescribed Zanaflex and recommended that Kostura be authorized to receive treatment for his lumbar spine. (Id.) He opined that Kostura was still disabled from truck driving at that point, but thought that Kostura could become employable in the future with appropriate therapy and rehabilitation for his lower back injury. (Id.)

Dr. Urbanc referred Kostura for a repeat right knee MRI on July 22, 2010. (Tr. 454) It revealed that there was no new meniscal tear or ligamentous tear. (Tr. 454) Dr. Fumich examined Mr. Kostura on July 29, 2010 for right knee pain and discomfort with exquisite localized tenderness. (Tr. 372) Dr. Fumich injected the area with cortisone and diagnosed right knee tendinitis and bursitis. (Id.) After a second injection did not provide significant improvement and Kostura reported a "popping" sensation, Dr. Fumich requested another MRI. (Tr. 371)

Throughout 2010 through 2012, Kostura reported continuing pain and discomfort of the right knee. (Tr. 370) In a July 26, 2011 letter relating to Kostura's worker's compensation claim denial, Dr. Fumich noted that Kostura's claim had been denied since Kostura's a MRI showed no tear or synovial pathology. (Tr. 367) Dr. Fumich also stated that he would not expect to see

3

synovial pathology on the MRI; and Kostura had a localized lesion and because of injury would have synovial pathology at the area of injury that would "in all likelihood" not be appreciated by the MRI. (Id.) He also noted that the MRI, while holding a high degree of accuracy in determining medial meniscal tears, was not "the gold standard and is not 100%." (Id.) Nevertheless, throughout 2011 and 2012 Dr. Fumich continued to wait on authorization for MRI and arthroscopy. (Tr. 369-71) In August 2012, Dr. Fumich noted that Kostura's right knee was giving out, that he ambulated with a cane, and kept his knee in an extended position (Tr. 368). It was also noted that Kostura continued to wait on authorization to treat his right knee and his back. (Id.)

On June 6, 2010, Dr. Zaas reexamined Kostura. (Tr. 464-65) During the examination, Kostura was able to push off, stand, and walk; but he complained of right knee pain. (Tr. 464). Kostura also complained of stiffness and soreness in his lower back and Dr. Zaas noted a slight lower lumbar muscle spasm. (Id.) Dr. Zaas opined that Kostura's right knee was the major source of Kostura's "continuing disability" but determined that "symptoms and abnormal physical findings related to the lumbar spine also contribute[d] to his disabling complaints." (Tr. 465)

Kostura was also under the care of Jon Marshall, D.O. On August 10, 2010, Dr. Marshall found restricted movement of the right knee for flexion, extension, abduction, adduction, and straight leg raising. (Tr. 494) Dr. Marshall also noted that Kostura experienced pain in the lumbosacral region during range of motion. (Id.) Monthly examinations through 2012 revealed crepitus[1] bilaterally over the anterior surface of both knees and continued discomfort on range of

---

[1] Crepitus: A grating sound or sensation produced by friction between bone and cartilage or the fractured parts of a bone. https://en.oxforddictionaries.com/definition/crepitus (last visited 4/03/17).

motion testing. (Tr. 467-88, 490-93). Dr. Marshall prescribed Vicodin and Voltaren for pain and to improve activities of daily living and functional capacity. (Id.)

From January through July 2013, Dr. Fumich repeatedly noted tenderness, positive grind, positive pinch flexion, and pain over the medial femoral condyle upon examination. (Tr. 608) During the same period, Dr. Marshall's examinations noted continued pain in the knee and back, as well as swelling of the knee. (Tr. 617-627).

After receiving the requested authorization, Dr. Fumich performed a second arthroscopy on August 30, 2013. (Tr. 691-692) On October 3, 2013, Dr. Fumich reported that Kostura's preoperative pain was gone although there was still some slight effusion. (Tr. 739) On December 12, 2013, Dr. Fumich discharged Kostura from treatment and cleared him to return to work. (Id.)

In May 2014, Kostura returned to Dr. Fumich and reported an incident of popping and giving out of his knee the week prior. (Id.) Examination revealed decreased range of motion and discomfort, but no effusion or instability. (Id.) An X-ray reportedly was not significant for arthritis and a MRI was ordered. (Id.) After the MRI, Dr. Fumich stated that the MRI could not exclude a new or recurrent tear. (Id.) He told Kostura to follow-up in a month to determine if a repeat arthroscopy was needed. (Id.) The following month there was no improvement in Kostura's knee condition and a repeat arthroscopy was scheduled. (Id.) On August 20, 2014, Dr. Fumich performed a third arthroscopy of Kostura's right knee. (Tr. 769, 780-86). One month following the surgery, Dr. Fumich reported that Kostura had regained full motion and that the preoperative pain was gone. (Tr. 770) It was noted, however, that Kostura had "quite a bit of atrophy," and that he needed to work on strengthening his right knee. On October 16, 2014, it was noted that Kostura had some achiness and atrophy. (Id.) It was recommended that Kostura

5

continue to work on his strength and return in a month, at which time he would be discharged. (Id.)

On October 23, 2014, it was recommended that Kostura complete 15 sessions of physical therapy (3 times a week for 5 weeks). (Tr. 813) It was noted that Kostura's long-term goals were to increase prolonged walking and standing for more than 30 minutes and to increase prolonged sitting for more than 20 minutes. (Tr. 798) His second day of physical therapy was the next day, on October 24, 2014. Kostura did not complete day three of physical therapy until January 5, 2015. (Tr. 820) At that time, it was noted that Kostura still exhibited pain and tenderness in his spine and right knee. (Id.) It was also noted that Kostura had a moderate to severe decrease with lumbar range of motion and that he exhibited a moderate decrease in range of motion with his cervical spine and right knee. (Id.)

### B. Opinion Evidence

#### 1. Dr. Urbanc

Dr. Urbanc completed a questionnaire on November 12, 2012, noting that Kostura experience daily pain of his right knee and low back. (Tr. 395) Dr. Urbanc also noted that Kostura experienced muscle spasm, positive trigger points, limited range of motion, muscle weakness, and depression due to continued pain (Tr. 395). Dr. Urbanc reported that Kostura walked with a slight limp and occasionally used a cane (Tr. 395). Dr. Urbanc opined that Kostura could only walk short distances before his right knee swelled, could not climb ladders and could only climb limited steps, could not lift more than 30 pounds and could not perform repetitive carrying and lifting (Tr. 395).

On August 26, 2013, Dr. Urbanc completed a second questionnaire. (Tr. 514). At that time, he reported that Kostura still experienced daily right knee, and to a lesser severity, low

6

back pain. (Id.) Dr. Urbanc also noted limited range of motion, limping, and an intermitted antalgic gait. (Id.) Dr. Urbanc opined that Kostura should not use ladders or stairs, engage in repetitive bending, lift more than 20 pounds, and should be able to sit as needed after walking or standing. (Id.)

There are no additional opinions from Dr. Urbanc following Kostura's third arthroscopy on August 20, 2014.

### 2. State Agency Reviewers

On January 5, 2013, state agency reviewing physician Michael Lehv, M.D., opined that Kostura would be limited to lifting and carrying 20 pounds occasionally and 10 pounds frequently. (Tr. 86) He also opined that Kostura could stand and walk for two hours and sit for six hours in an eight-hour workday (Tr. 86). Dr. Lehv further determined that Kostura would be limited to occasional postural activities, and had to avoid all exposure to hazards (Tr. 86-87). In October 2013, state agency reviewing physician, Dr. Diane Manos, M.D. agreed with Dr. Lehv's opinion. (Tr. 115).

## IV. Testimonial Evidence

Kostura testified at the hearing[2] that he had three surgeries on his right knee but still experienced knee popping and his knee giving way. (Tr. 44, 51-52) Kostura stated that his knee had been acting up since his most recent surgery. (Tr. 45) When asked if he was in therapy, Kostura stated that "[t]hey totally cut out my therapy." (Id.) Kostura testified that he received chiropractic care for his back pain. (Id.) He also testified that he treated with Tylenol because of difficulties with his insurance. (Tr. 47)

---

[2] Vocational Expert Gail Klier ("VE") also testified at the hearing. (Tr. 56-66) However, since the VE's testimony is not at issue in this appeal, it will not be summarized herein.

Kostura testified that he could sit for about 45 minutes at a time before needing to get up. (Tr. 49)  When questioned by his attorney, Kostura stated that he could probably sit for six hours total in a day and would probably need to get up more than a dozen times on a pretty good day. (Tr. 53)

**V.     Standard for Disability**

Under the Act, 42 U.S.C. § 423(a), eligibility for benefit payments depends on the existence of a disability.  "Disability" is defined as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(a).  Furthermore:

> [A]n individual shall be determined to be under a disability only if his physical or mental impairment or impairments are of such severity that he is not only unable to do his previous work but cannot, considering his age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy[3]….

42 U.S.C. § 423(d)(2)(A).

In making a determination as to disability under this definition, an ALJ is required to follow a five-step sequential analysis set out in agency regulations.  The five steps can be summarized as follows:

1. If the claimant is doing substantial gainful activity, he is not disabled.

2. If claimant is not doing substantial gainful activity, his impairment must be severe before he can be found to be disabled.

3. If claimant is not doing substantial gainful activity, is suffering from a severe impairment that has lasted or is expected to last for a continuous period of at

---

[3] "[W]ork which exists in the national economy' means work which exists in significant numbers either in the region where such individual lives or in several regions of the country."  42 U.S.C. § 423 (d)(2)(A).

8

least twelve months, and his impairment meets or equals a listed impairment, claimant is presumed disabled without further inquiry.

4. If the impairment does not meet or equal a listed impairment, the ALJ must assess the claimant's residual functional capacity and use it to determine if claimant's impairment prevents him from doing past relevant work. If claimant's impairment does not prevent him from doing his past relevant work, he is not disabled.

5. If claimant is unable to perform past relevant work, he is not disabled if, based on his vocational factors and residual functional capacity, he is capable of performing other work that exists in significant numbers in the national economy.

20 C.F.R. §§ 404.1520, 416.920; *Bowen v. Yuckert,* 482 U.S. 137, 140-142 (1987). Under this sequential analysis, the claimant has the burden of proof at Steps One through Four. *Walters v. Comm'r of Soc. Sec.* 127 F.3d 525, 529 (6th Cir. 1997). The burden shifts to the Commissioner at Step Five to produce evidence that establishes whether the claimant has the RFC and vocational factors to perform work available in the national economy. *Id.*

## VI. The ALJ's Decision

The ALJ issued a decision on May 1, 2015. A summary of her findings are as follows:

1. Kostura meets the insured status requirements of the Social Security Act through December 31, 2014. (Tr. 19)

2. Kostura has not engaged in substantial gainful activity since April 30, 2009, the alleged onset date. (Tr. 19)

3. Kostura has the following severe impairments: degenerative disc disease; degenerative joint disease of the right knee post multiple surgeries; obesity; borderline intellectual functioning. (Tr. 19)

4. Kostura does not have an impairment or combination of impairments that meets or medically equals the severity of one of the listed impairments. (Tr. 20)

5. Kostura has the residual functional capacity ("RFC") to perform sedentary work except: standing/walking 2 in an 8-hour workday; sit for 6 hours; with a sit stand option every hour for 5 min (would not have to leave workstation); occasionally climb stairs ramps; no climbing ladders, ropes, scaffolds; occasionally balance, stoop,

9

crouch, no kneel or crawl; can reach in front, occasionally overhead; can handle, finger and feel; no hazards such as unprotected heights or moving machinery; perform simple routine tasks with simple short instructions; make simple decisions; few workplace changes; no fast past (sic) production quotas. (Tr. 22)

6. Kostura is unable to perform any past relevant work. (Tr. 25)

7. Kostura was born on July 9, 1974, and was 34 years old, which is defined as a younger individual age 18-44, on the alleged disability onset date. (Tr. 25)

8. Kostura has at least a high school education and is able to communicate in English. (Tr. 25)

9. Transferability of jobs skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled" whether or not the claimant has transferable job skills. (Tr. 25)

10. Considering Kostura's age, education, work experience, and RFC, there are jobs that exist in significant numbers in the national economy that she can perform. (Tr. 26)

Based on these findings, the ALJ determined that Kostura had not been under a disability from April 30, 2009, through the date of the decision. (Tr. 26)

## VII. Law & Analysis

### A. Standard of Review

This court's review is limited to determining whether there is substantial evidence in the record to support the ALJ's findings of fact and whether the correct legal standards were applied. *See Elam v. Comm'r of Soc. Sec.,* 348 F.3d 124, 125 (6th Cir. 2003) ("decision must be affirmed if the administrative law judge's findings and inferences are reasonably drawn from the record or supported by substantial evidence, even if that evidence could support a contrary decision."); *Kinsella v. Schweiker,* 708 F.2d 1058, 1059 (6th Cir. 1983). Substantial evidence has been defined as "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Rogers v.*

*Comm'r of Soc. Sec.,* 486 F.3d 234, 241 (6th Cir. 2007) (quoting *Cutlip v. Sec'y of Health and Human Servs.,* 25 F.3d 284, 286 (6th Cir. 1994).

The Act provides that "the findings of the Commissioner of Social Security as to any fact, if supported by substantial evidence, shall be conclusive." 42 U.S.C. §§ 405(g) and 1383(c)(3). The findings of the Commissioner are not subject to reversal merely because there exists in the record substantial evidence to support a different conclusion. *Buxton v. Halter,* 246 F.3d 762, 772-3 (6th Cir. 2001) (*citing Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986); *see also Her v. Comm'r of Soc. Sec.,* 203 F.3d 288, 389-90 (6th Cir. 1999) ("Even if the evidence could also support another conclusion, the decision of the Administrative Law Judge must stand if the evidence could reasonably support the conclusion reached.") *See Key v. Callahan,* 109 F.3d 270, 273 (6th Cir. 1997). This is so because there is a "zone of choice" within which the Commissioner can act, without the fear of court interference. *Mullen,* 800 F.2d at 545 (*citing Baker v. Heckler,* 730 F.2d 1147, 1150 (8th Cir. 1984).

### B. Credibility Analysis

Kostura presents a single issue for review. He argues that the ALJ improperly analyzed his credibility. ECF Doc. No. 14, Page ID# 914-18. Importantly, Kostura admits that the ALJ discussed the regulatory factors for assessing credibility provided in SSR 96-7p.[4] Nonetheless, he contends that the ALJ erred by failing to adopt his subjective complaint that he had to get up

---

[4] These factors include: (1) The individual's daily activities; (2) The location, duration, frequency, and intensity of the individual's pain or other symptoms; (3) Factors that precipitate and aggravate the symptoms; (4) The type, dosage, effectiveness, and side effects of any medication the individual takes or has taken to alleviate pain or other symptoms; (5) Treatment, other than medication, the individual receives or has received for relief of pain or other symptoms; (6) Any measures other than treatment the individual uses or has used to relieve pain or other symptoms (e.g., lying flat on his or her back, standing for 15 to 20 minutes every hour, or sleeping on a board); and (7) Any other factors concerning the individual's functional limitations and restrictions due to pain or other symptoms. SSR 97-6p, Titles II and XVI: Evaluation of Symptoms in Disability Claims: Assessing the Credibility of an Individual's Statements, 61 FR 34483-01

from a seated position "more than a dozen times" during a six-hour period. Id. at 916. Kostura's argument is not well taken.

Although Kostura now asserts that he testified that he had to get up from a seated position "more than a dozen times" in a six-hour period, the record belies this assertion. The relevant testimony elicited by his attorney is as follows:

> Q. Okay. All right. If you add up how much you sit during the day – and I know you've said that you sit a while, sometimes yes and no. During a day, do you think you can sit six hours if you added it all up?
>
> A. Probably so.
>
> Q. Okay. How often – during a pretty good day, how often do you think you'd have to get up from a seated position?
>
> A. Probably more than a dozen times.
>
> Q. Okay. So more than a dozen times during the six hours. Do you do anything else during the day to reduce your pain, besides take Tylenol?
>
> A. No.

Counsel initially asked Kostura if he added up all the times he could sit in a day would he be able to sit for six hours. Kostura answered, "[p]robably so."

Kostura's counsel then asked how often on a "pretty good day" Kostura would have to get up from a seated position. Kostura stated "[p]robably more than a dozen times." Counsel then took this to mean that Kostura had to get up from a seated position more than a dozen times in a six-hour period. However, that interpretation was not an accurate representation of Kostura's testimony.

Kostura was asked if he added up how much time he sat in a day, would he be able to sit for six hours total. The implication of "adding it up" was that Kostura could not sit for six hours straight. This is consistent with Kostura's earlier testimony that he could sit for approximately

45 minutes at a time before needing to get up. (Tr. 49) However, he did not testify that he had to get up a dozen times within a six-hour period. Counsel asked how often Kostura had to get up from his seat on a "pretty good day." It was unclear whether counsel's reference to a day meant an eight-hour workday or an entire waking day. However, there was nothing to support the suggestion that a "pretty good day" meant six hours. If Kostura could sit for six hours in a day, it would follow that a "day" would be longer than six hours because it would have to include the time he intermittently gets up to stand. Therefore, Kostura's representation in his brief that the word "day" in his testimony should be interpreted as a six-hour time period is erroneous. Accordingly, Kostura's contention that the ALJ erred by not adopting his testimony that he had to get up a dozen times in a six-hour period is not well taken because Kostura did not testify that he had to get up a dozen times in a six-hour period.

Moreover, to the extent that Kostura's brief can be interpreted to include a general challenge to the ALJ's credibility determination, the ALJ's decision to discount Kostura's credibility is accorded substantial deference and is supported by the record. In evaluating Kostura's subjective complaints, the ALJ found that Kostura's testimony "was not persuasive to establish an inability to perform [sedentary] work…" (Tr. 25) The ALJ pointed to Kostura's testimony that he felt that he could sit for a total of six hours and sit for 45 minutes at a time. (Tr. 25, 49, 52). She also acknowledged Kostura's testimony that he could not think of a reason he could not perform sedentary work. (Tr. 25) On that point, the ALJ asked Kostura:

> Q: Okay. So if you – if you had a job where you didn't have to walk around too much an you could sit most of the day and sometimes, you know, get up every now and then, you weren't lifting anything heavy, what would stop you from doing something like that?

Kostura answered: "Don't know." (Tr. 50). The implication is unmistakable; Kostura knew he could do such a job.

13

The ALJ provided an RFC that was nearly consistent with this evidence (i.e., that Kostura could perform sedentary work but could only sit for 6 hours in an 8-hour workday with a sit stand option every hour for 5 minutes). (Tr. 22) The ALJ also supported her RFC finding and credibility determination by pointing out that Kostura does laundry, takes out the trash, shops, cares for himself, fishes, and runs errands. (Tr. 23) The ALJ further noted that Kostura improved after each surgery and that his current physical examination was mostly unremarkable. (Tr. 25) The ALJ stated that Kostura came to the hearing with a cane, but that two of his doctors noted that he does not require an assistance device. (Tr. 25) The ALJ also pointed out that Kostura's biggest problem was actually his knee, not his back, and that after his knee initially healed with surgery he was released to go back to work. (Tr. 23, 24)

Thus, the ALJ did not summarily reject Kostura's complaints; rather, she determined that the RFC adequately accounted for Kostura's limitations based on a review of all of the evidence. Kostura has not shown how this determination was erroneous – particularly in light of the ALJ's thorough discussion of the regulatory factors and the substantial deference accorded to an ALJ's credibility determination. *See Siterlet v. Sec'y of Health & Human Servs.,* 823 F.2d 918, 920 (6th Cir.1987); *Villarreal v. Sec'y of Health & Human Servs.,* 818 F.2d 461, 463 (6th Cir.1987). The Sixth Circuit instructs that this court "may not disturb" a credibility determination "absent [a] compelling reason." *Smith v. Halter*, 307 F.3d 377, 379 (6th Cir. 2001). The undersigned cannot find any fault with the ALJ's credibility determination. As a result, I find that the ALJ supported her determination of this claim with substantial evidence.

## VIII. Recommendation

Kostura has not demonstrated a basis upon which to reverse or remand the Commissioner's decision. Accordingly, I recommend that the final decision of the Commissioner be **AFFIRMED**, pursuant to 42 U.S.C. §405(g).

Dated: May 24, 2017

Thomas M. Parker
United States Magistrate Judge

---

**OBJECTIONS**

Any objections to this Report and Recommendation must be filed with the Clerk of Courts within fourteen (14) days after being served with a copy of this document. Failure to file objections within the specified time may waive the right to appeal the District Court's order. See *U.S. v. Walters*, 638 F.2d 947 (6th Cir. 1981). See also *Thomas v. Arn,* 474 U.S. 140 (1985), reh'g denied, 474 U.S. 1111 (1986).